**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**EDITH BENNETT,**

                    **Plaintiff,**

       **vs.**

**MICHAEL J. ASTRUE**, Commissioner of Social
Security Administration,[1]

                  **Defendant.**
_____

**1:06-CV-0649**
**(NAM)**

| **APPEARANCES:** | **OF COUNSEL:** |
| --- | --- |
| Empire Justice Center | Louise Maria Tarantino, Esq. |
| 119 Washington Avenue | |
| 2nd Floor | |
| Albany, New York 12210 | |
| Attorney for Plaintiff | |
| | |
| Andrew Baxter | |
| United States Attorney for | |
| the Northern District of New York | |
| P.O. Box 7198 | |
| 100 South Clinton Street | |
| Syracuse, New York 13261-7198 | |
| and | |
| Social Security Administration | Karla J. Gwinn, Esq. |
| Office of Regional General Counsel | Barbara L. Spivak, Esq. |
| Region II | |
| 26 Federal Plaza - Room 3904 | |
| New York, New York 10278 | |
| Attorneys for Defendant | |

**Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

_____

[1]  Michael J. Astrue became Commissioner of Social Security on February 12, 2007.  Pursuant to Federal
Rule of Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.

In this action, plaintiff Edith Bennett, moves, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for a review of a decision by the Commissioner of Social Security denying plaintiff's application for disability benefits. (Dkt. No. 1). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.     FACTUAL BACKGROUND

Plaintiff was born on June 21, 1963 and was 41 years old at the time of the administrative hearing on June 1, 2005. (Administrative Transcript at p. 95, 265)[2].  At the time of the hearing, plaintiff had a daughter (18 years old), a son (20 years old) and 3 young grandchildren.  (T. 267). Plaintiff testified that she was not married and resided in a second floor apartment with her daughter and grandson in Troy, New York.  (T. 266-268).  In 1981, plaintiff graduated from high school. (T. 109).  From 1981 through 1982, plaintiff attended classes in general office procedures at the Educational Opportunity Center in Albany.  (T. 109).   From 1997 until 2002, plaintiff was employed at Price Chopper as a cashier and at the deli counter. (T. 104).  Plaintiff's job required her to walk, stand, stoop, handle, grab, grasp, write and handle small objects for 4-7 hours each day.  (T. 104).  Plaintiff's job required her to lift 25 pounds frequently.  (T. 104).  Plaintiff claims that she was last employed in April 2002. (T. 103).  Plaintiff states that she became disabled on December 2, 2002 due to a "combination of impairments".  (T. 17).

### A.     Medical Evidence

A review of the record reveals that plaintiff was treated for her alleged disabling conditions by Abdul S. Khan, M.D., David Bruce, M.D. and Adetutu Adetona, M.D.  Plaintiff

---

[2] Portions of the administrative transcript, Dkt. No. 6, will be cited herein as "(T. )".

also treated at Samaritan Hospital Behavioral Health Services and at Seton Health Sleep Laboratory.[3]

Abdul S. Khan, M.D.

On October 16, 2002, plaintiff was examined by Dr. Khan, a neurologist at Capital Neurological Associates, at the request of Dr. Ashok Baghel.[4] (T. 180). Plaintiff complained of bitemporal headaches associated with photophobia and phonophobia.[5] (T. 180). Plaintiff also complained of blurred vision and dizziness. (T. 180). Dr. Khan noted that stress contributed to plaintiff's pain as she was caring for her 2-month old grandson. (T. 180). Plaintiff stated she was a housewife and lived with her son, daughter and grandson. (T. 180). Upon examination, Dr. Khan noted plaintiff was alert and oriented with normal speech and language. (T. 181). Dr. Khan found that plaintiff's muscle strength and muscular examination were normal. (T. 181). Dr. Khan diagnosed plaintiff with headaches and prescribed Depakote.[6] (T. 182).

On December 23, 2002, plaintiff returned to Dr. Khan for a follow-up evaluation. (T. 183). Plaintiff stated that her headaches were better and that she had no side-effects from the medication. (T. 183). Plaintiff complained of right elbow pain "shooting to her fingers", dizziness and tinnitus. (T. 183). Plaintiff's examination was normal and Dr. Khan noted plaintiff's migraine headaches were "well controlled on Depakote". (T. 184). Dr. Khan recommended an EMG/nerve conduction study for plaintiff's elbow pain. (T. 184).

---

[3] The record contains treatment notes from doctors and/or facilities for illnesses/conditions that are unrelated to the issues at hand. A summary of those records has been omitted from this discussion.

[4] The record does not contain any treatment notes or reports from Dr. Baghel.

[5] Photophobia is abnormal visual tolerance of light. *Dorland's Illustrated Medical Dictionary*, 1461 (31st ed. 2007). Phonophobia is an irrational fear of sounds or of speaking aloud. *Id.* at 1456.

[6] Depakote is used in the treatment of manic episodes associated with bipolar disorder. *Id.* at 497, 565.

On February 10, 2003, Dr. Khan performed an EMG and found an abnormal study which was "suggestive of mild median neuropathy at wrist on right side consistent with carpal tunnel syndrome". (T. 186). Dr. Khan noted that plaintiff could not tolerate the needle examination so "radiculopathy could not be ruled out". (T. 186).

David Bruce, M.D.

On November 20, 2003, plaintiff was examined by Dr. David Bruce at Pulmonary and Critical Care Services, P.C. (T. 206). Dr. Bruce noted that he originally saw plaintiff on November 6, 2003 for complaints of shortness of breath when walking up hills.[7] (T. 206). Plaintiff complained of wheezing and coughing episodes that caused respiratory distress during the night. (T. 206). Dr. Bruce noted that plaintiff had asthma and significant problems with esophageal reflux.[8] (T. 206). Dr. Bruce stated that plaintiff's chest x-ray revealed possible emphysema.[9] (T. 154). Dr. Bruce prescribed Nexium and Reglan.[10] (T. 206-207). Dr. Bruce noted that an upper GI series was "done subsequently" and documented position-related esophageal reflux without stricture and normal spirometry.[11] (T. 207).

---

[7] The record does not contain any reports or notations from Pulmonary and Critical Care Services, P.C. or Dr. Bruce prior to November 20, 2003.

[8] Esophageal reflux is reflux of the stomach and duodenal contents into the esophagus, which sometimes occurs normally, or as a chronic pathological condition that leads to the condition known as gastroesophageal reflux disease. *Dorland's* at 1640.

[9] Emphysema is a pathological accumulation of air in tissues or organs. *Id*. at 617.

[10] Nexium is a proton pump inhibitor used as a gastric acid secretion inhibitor in the treatment of symptomatic gastroesophageal reflux disease. *Id*. at 654, 1293. Reglan stimulates gastric motility, used as an antiemetic, as an adjunct in gastrointestinal radiology and intestinal intubation, and in the treatment of gastroparesis and gastroesophageal reflux. *Id*. at 1172, 1644

[11] Stricture is stenosis (an abnormal narrowing of a duct or canal). *Dorland's* at 1795, 1811. Spirometry is the measurement of the breathing capacity of the lungs, such as in pulmonary function tests. *Id*. at 1776.

On April 9, 2004, plaintiff returned to Dr. Bruce's office for treatment for a cough. (T. 208).  Plaintiff claimed she had no improvement with her shortness of breath and continued to have heartburn despite taking Nexium. (T. 208).  Plaintiff was examined by Rita Alowitz, a nurse practitioner. (T. 208).  Nurse Alowitz noted plaintiff's examination was "normal".  Nurse Alowitz concluded that plaintiff's significant reflux was the cause of the cough. (T. 209).  Nurse Alowitz advised plaintiff to complete the course of medication previously prescribed by her primary care physician including steroids, antibiotics, Combivent and Albuterol.[12] (T. 209).

From May 2004 until December 2004, plaintiff continued to treat with Dr. Bruce for complaints of shortness of breath and a cough. (T. 147, 150, 210).  On December 29, 2004, plaintiff had her last visit with Dr. Bruce.  (T. 148).  Dr. Bruce's diagnosis was unchanged and plaintiff was advised to return in one year with a pulmonary function test. (T. 149).

<u>Seton Health Sleep Laboratory</u>

On June 8, 2004, plaintiff had an initial sleep consultation at Seton Health Sleep Laboratory. (T. 192).  Plaintiff was examined by Dr. Khaula Rehman who noted plaintiff complained of fatigue, sleepiness, restless leg and arm movements and coughing during the night. (T. 192).  Plaintiff stated that her sleepiness interfered with her daily activities and Dr. Rehman noted plaintiff scored an 11 out of 24 on the Epworth Sleepiness Scale.[13] (T. 192).  Plaintiff

---

[12] Combivent is administered by oral inhalation as a bronchodilator in the maintenance treatment of chronic bronchitis, pulmonary emphysema, and other forms of chronic obstructive pulmonary disease, and intranasally for the relief of rhinorrhea associated with rhinitis or the common cold. *Id.* at 397, 972. Albuterol is administered by inhalation for the treatment and prophylaxis of bronchospasm associated with bronchitis, pulmonary emphysema, or other chronic obstructive airway disease, the treatment of asthma-associated bronchospasm, and the prophylaxis of exercise-induced bronchospasm. *Id.* at 46.

[13] The Epworth Sleepiness Scale is a questionnaire intended to measure daytime sleepiness and is utilized in diagnosing sleep disorders.  http://www.umm.edu/sleep/epworth (last visited September 3, 2008).

advised that she took Trazadone for insomnia but that it did not help her fall asleep.[14] (T. 192). Upon examination, Dr. Rehman noted plaintiff's extremities and muscle strength were normal. (T. 193). Dr. Rehman diagnosed plaintiff with GERD, depression, severe emphysema and restless leg syndrome.[15] (T. 193). Dr. Rehman also noted a "high suspicion of sleep apnea". (T. 193). Dr. Rehman advised plaintiff to avoid alcohol, refrain from driving, to sleep on her side. (T. 193). Dr. Rehman scheduled plaintiff for diagnostic sleep studies and a CPAP study.[16] (T. 193). Dr. Rehman noted plaintiff would follow-up and treat with the director of the sleep center, Dr. Zia Shah. (T. 193). On June 8, 2004, Dr. Shah reviewed plaintiff's diagnostic sleep study and found the study consistent with mild to moderate sleep apnea. (T. 189).

On June 26, 2004, Dr. Shah reviewed the CPAP Study and noted that CPAP pressure partially improved plaintiff's RDI.[17] (T. 190). Dr. Shah prescribed a CPAP machine with pressure of 10 cm, encouraged plaintiff to lose weight and to sleep on her side. (T. 191). On June 26, 2004, plaintiff also had a follow up with Dr. Rehman. (T. 188). Plaintiff stated she still snored and noted that her boyfriend told her that she stopped breathing during the night. (T. 188). Plaintiff was diagnosed with mild to moderate sleep apnea, allergies and emphysema. (T. 188). Dr. Rehman prescribed Flonase for plaintiff's allergies. (T. 188).

---

[14] Trazadone is an antidepressant used to treat major depressive episodes with or without prominent anxiety. *Dorland's* at 1983.

[15] GERD is an abbreviation for gastroesphageal reflux disease. http://www.medilexicon.com (last visited September 3, 2008).

[16] CPAP is an abbreviation for continuous positive airway pressure. http://www.medilexicon.com (last visited September 3, 2008).

[17] RDI is an abbreviation for respiratory distress index. http://www.medilexicon.com (last visited September 3, 2008).

On October 19, 2004, plaintiff had her last visit at the Sleep Laboratory. (T. 187). Plaintiff stated she was "feeling better" with CPAP use and that her average use was almost 6 hours at night. (T. 187).  Dr. Shah's diagnosis was unchanged and he advised plaintiff to continue using the CPAP machine and to return in 4 months. (T. 187).

Adetutu Adetona, M.D.

On March 1, 2004, plaintiff had an initial examination with Dr. Adetona at Lansingburgh Family Practice.[18] (T. 175).  Plaintiff claimed that she suffered from a heart murmur, right wrist tendinitis, GERD, headaches, depression, breathlessness and a sleep disorder.  (T. 175).  Plaintiff stated that she was prescribed Depakote but stopped taking the medication three weeks earlier due to weight gain. (T. 175).  Plaintiff advised that she lived with her children and her fiancé.  (T. 175).  Dr. Adetona performed a new patient physical and diagnosed plaintiff with COPD, sleep disorder, chronic headaches and GERD. (T. 174).

From April 2004 until March 2005, plaintiff continued to treat at Lansingburgh Family Practice complaining of shortness of breath, coughing, right shoulder pain and headaches. (T. 161-173).   On April 14, 2004, an MRI of plaintiff's brain and pituitary gland was performed at Seton Health Medical Imaging at the request of Dr. Adetona. (T. 179).  The radiologist found no evidence of intracranial mass.  (T. 179).  On April 21, 2004, an echocardiogram was performed at Dr. Adetona's request due to plaintiff's complaints of chest pains. (T. 178).  The impression was "normal study". (T. 178).

Samaritan Hospital Behavioral Health Services

---

[18] The records from Lansingburgh Family Practice consist entirely of handwritten notations on pre-printed forms.  In most instances, the reports/notations are illegible and difficult to decipher.

On April 6, 2005, plaintiff appeared as a "self referral" at the mental health unit of Samaritan Hospital.  (T. 156-157).  Plaintiff complained of depression, fatigue and stress. (T. 157).   A Comprehensive Assessment Update was prepared by Karen Welthy, a social worker. (T. 156).  Ms. Welthy noted that plaintiff was a "returning client" who last treated in February 2005 but missed appointments due to child care constraints.[19]  (T. 156).  Plaintiff stated that she returned because she was stressed with family issues including her daughter's recent attempt at suicide and her son's legal troubles.  (T. 156).  Ms. Welthy also noted that plaintiff had problems with her fiancé who had a personality disorder, drug addiction and history of beating women. (T. 156).   Plaintiff admitted to having a history of crack/cocaine abuse which she claimed ended 8 years ago and a history of alcohol abuse. (T. 156).

Upon examination, Ms. Welthy noted plaintiff was alert and oriented with normal concentration, speech and memory. (T. 156).  Ms. Welthy noted plaintiff appeared stressed and depressed and that plaintiff did not have much insight into the abuse in her relationship.  (T. 156). Plaintiff denied any suicidal or homicidal ideas and contracted with Ms. Welthy for her safety. (T. 156).  Ms. Welthy diagnosed plaintiff with major depressive disorder without psychotic features, personality disorder and COPD.[20] (T. 156).  Ms. Welthy noted plaintiff was overwhelmed by stressors including her abusive relationship and caring for her twin grandchildren due to her daughter's suicide attempt. (T. 156).  Ms. Welthy recommended outpatient treatment with medication management and group therapy for domestic violence issues. (T. 156).

---

[19] The record contains no treatment notes/reports from Samaritan Behavioral Services prior to April 6, 2005.

[20] COPD is an abbreviation for chronic obstructive pulmonary disease.  http://www.medilexicon.com (last visited September 3, 2008).

A mental status examination was performed by N. Achar, M.D., a psychiatrist. (T. 160). Dr. Achar noted plaintiff had no suicidal ideation and that she was at a "low" risk for suicide. (T. 160). Dr. Achar noted plaintiff's examination was "within normal limits" and prescribed Lexapro.[21] (T. 159 - 160).

On June 23, 2005, Catherine Hepp, a social worker, prepared a Treatment Plan. (T. 227). Ms. Hepp noted plaintiff was admitted on May 24, 2005 with a diagnosis of major depression, personality disorder and COPD. (T. 227). Ms. Hepp identified plaintiff's problems as excessive care taking with adult children, difficulty setting limits and past trauma. (T. 227). Ms. Hepp anticipated discharging plaintiff on December 2006 if plaintiff was able to manage her symptoms with an understanding of limits. (T. 227).

On August 19, 2005, Dr. Achar completed a Behavioral Health Comprehensive Treatment Plan. (T. 229). Dr. Achar noted plaintiff's mental status examination to be "within normal limits" with the exception of plaintiff's sleep and mood which he described as "abnormal". (T. 230). Dr. Achar noted plaintiff's depression was "ok" but that she experienced nightmares and PTSD symptoms due to remembering a rape that occurred when she was 13 years old.[22] (T. 231). Dr. Achar diagnosed plaintiff with major depression, sleep apnea and some PTSD symptoms. (T. 231). Dr. Achar advised plaintiff to continue taking Lexapro and added Abilify to her medication regimen.[23] (T. 231).

---

[21] Lexapro is an antidepressant. *Dorland's* at 654, 1047.

[22] PTSD is an abbreviation for post traumatic stress disorder. http://www.medilexicon.com (last visited September 3, 2008).

[23] Abilify is an antipsychotic used in the treatment of schizophrenia and of acute manic and mixed episodes of bipolar disorder. *Id.* at 4, 133.

On September 19, 2005, plaintiff had her last evaluation with Dr. Achar. (T. 233).  Dr. Achar noted that plaintiff's mental status examination was "unchanged".  (T. 233).  Dr. Achar noted plaintiff missed appointments because she was "working nights since finding out her 18 year old is pregnant". (T. 233).  On November 11, 2005, Dr. Achar performed a medical review and noted plaintiff felt tired when she was not working. (T. 234).  Dr. Achar's diagnosis and treatment plan were unchanged. (T. 234).

### B.        Consultative Examination - Lisa Zhang, M.D.

On June 12, 2003, Dr. Zhang performed an internal medicine examination of plaintiff at the request of the agency. (T. 122).  Plaintiff was accompanied by her boyfriend and complained of migraine headaches, seizures, carpal tunnel syndrome in the right hand, blurred vision, low back pain, allergies and asthma. (T. 122).  Plaintiff admitted that she smoked 1 ½ to 2 packs of cigarettes each day. (T. 123).  Dr. Zhang noted that plaintiff did not use an ambulatory device. (T. 123).  Plaintiff advised that she cooked 4 to 7 times each week, cleaned 5 days a week, did laundry every day, shopped twice a month and was able to dress herself. (T. 123).

Upon examination, Dr. Zhang noted plaintiff was able to perform heel and toe walks, plaintiff's gait and stance were normal, squat was full and plaintiff need no assistance during the examination. (T. 123).  Dr. Zhang noted that plaintiff exhibited a full range of motion in her cervical and lumbar spine, plaintiff's straight leg raising was 75 degrees bilaterally with pain but negative when sitting, plaintiff's strength was "5/5" in upper and lower extremities, and plaintiff's hip range of motion was full.  (T. 124).  Dr. Zhang noted no evidence of swelling or effusion. (T. 124). Dr. Zhang found that plaintiff's dexterity in her fingers and hand was intact and grip strength was 4/5 on the right and 5/5 on the left.  (T.1 24).  Dr. Zhang requested an x-ray of plaintiff's right wrist which was found to be "unremarkable". (T. 126).

Dr. Zhang diagnosed plaintiff was migraine headaches, seizure disorder, asthma, carpal tunnel syndrome and low back pain. (T. 125).  Dr. Zhang opined that plaintiff had mild restrictions in carrying and lifting with her right hand.  (T. 125).  Dr. Zhang also concluded that plaintiff should avoid driving, operating machinery, smoke, dust or other respiratory irritants. (T. 125).

### C.      Residual Functional Capacity ("RFC") Assessment

On June 27, 2003, C. Petion, a medical consultant, completed a Physical Residual Functional Capacity Assessment at the request of the agency.[24]  (T. 134).  The analyst noted plaintiff's primary diagnosis was seizures and secondary diagnosis was asthma. (T. 127).  The analyst also noted migraine headaches as plaintiff's "other alleged impairments". (T. 127).  The analyst concluded that plaintiff could occasionally lift and/carry 50 pounds and frequently lift and/or carry 25 pounds.  (T. 128).  The analyst also found that plaintiff could stand and/or walk and sit for 6 hours in an 8 hour workday and that plaintiff was unlimited in her ability to push and/or pull. (T. 128).  The analyst opined that plaintiff could balance, stoop, kneel, crouch and call but could not climb. (T. 129).  The analyst also found that plaintiff should avoid fumes, odors, dusts, gases and hazards. (T. 131).  The analyst noted that plaintiff's credibility could not be assessed based upon available information and that the opinions of plaintiff's doctors were not consistent with his conclusions. (T. 132-133).

## III.     PROCEDURAL HISTORY

On March 18, 2003, plaintiff filed applications for supplemental security income ("SSI") benefits and disability insurance benefits ("DIB").  (T. 79).  On August 19, 2003, the applications were denied.  (T. 27).  Plaintiff requested a hearing which was held before an Administrative Law

---

[24] The record does not contain the analyst's qualifications or title.

Judge ("ALJ").[25]  (T. 239).  On July 22, 2005, ALJ Thomas P. Zolezzi issued a decision denying

plaintiff's claims for benefits.  (T. 16-25).  On March 23, 2006, the Appeals Council denied

plaintiff's request for review, rendering the ALJ's decision the final determination of the

Commissioner.  (T. 4).  Exhausting all her options for review through the Social Security

Administration's tribunals, plaintiff brings this appeal. (Dkt. No. 1).

## IV.    ADMINISTRATIVE LAW JUDGE'S DECISION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to

individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less than

12 months."  42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability

claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2)
> that he has a 'severe impairment,' (3) that the impairment is not one [listed in
> Appendix 1 of the regulations] that conclusively requires a determination of disability,
> and (4) that the claimant is not capable of continuing in his prior type of work, the
> Commissioner must find him disabled if (5) there is not another type of work the
> claimant can do." The claimant bears the burden of proof on the first four steps, while
> the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311

F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal

citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in substantial gainful

activity since her alleged onset date.  (T. 17).  At step two, the ALJ concluded that plaintiff's

---

[25] The administrative hearing was adjourned several times.

asthma and depression were "severe" impairment. [26] (T. 20).   At the third step of the analysis,

the ALJ determined that plaintiff's impairments did not meet or equal the severity of any

impairment listed in Appendix 1 of the Social Security Regulations (the "Regulations").  (T. 20).

At the fourth step, the ALJ found that plaintiff had the RFC to:

> perform work at a medium exertional level; with occasional but not frequent
> repetitive use of the dominant right hand; with no concentrated exposure to dust,
> fumes, odors, gases, smoke or poor ventilation; with no driving for business
> purposes; with no work with dangerous machinery, such as saws or blades; with no
> climbing ladders or work at heights; in a low stress environment, with no planning,
> scheduling, report-writing, supervising or high production quotas; in  simple entry-
> level work, with simple but not complex decision-making; with the ability to change
> position as needed, with a sit/stand option every 30 to 40 minutes; with little or no
> interaction with the public, either face-to-face, or on the phone; and with occasional
> but not frequent interaction with co-workers, working in proximity to co-workers,
> but only occasionally in coordination or conjunction with them.  (T. 21).

Accordingly, the ALJ concluded that plaintiff was not capable of performing her past

relevant work.  (T. 22).  Since plaintiff claimed that she suffered from exertional and non-

exertional limitations, the ALJ obtained the testimony of a vocational expert to determine whether

there were jobs plaintiff could perform.  Based upon the vocational expert's testimony, the ALJ

concluded at step five, that there were a significant number of jobs in the regional and national

economy that plaintiff could perform, such as work as a collator operator, photo copy machine

operator, surveillance system monitor, laundry sorter, furniture cleaner, mail clerk and addresser.

(T. 23).  Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the

Social Security Act.  (T. 23).


## V.      DISCUSSION

---

[26] In the portion of the decision entitled "Evaluation of the Evidence", the ALJ found that plaintiff's
depression and asthma were "severe" impairments.  (T. 20).  However, in the portion of the decision entitled
"Findings", the ALJ concluded that plaintiff's depression, asthma and right carpal tunnel syndrome were considered
"severe".  (T. 23). This discrepancy will be discussed *infra*.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the ALJ's decision regarding the severity of plaintiff's impairments is not supported by substantial evidence; (2) the ALJ's RFC determination is not supported by substantial evidence; and (3) the ALJ relied upon the vocational expert's response to a defective hypothetical and thus, the Commissioner did not sustain his burden of proof at step five of the sequential evaluation process.  (Dkt. No. 7).

## A.    Severity

Plaintiff argues that the ALJ erred in finding that plaintiff's carpal tunnel syndrome, headaches and sleep apnea were "nonsevere" impairments. (Dkt. No. 11, pp. 14-16).  Defendant claims the evidence demonstrates that those impairments did not significantly limit plaintiff's ability to perform basic work activities and therefore, were not severe impairments.  (Dkt. No. 13, p. 7).

Step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).  "Basic work activities" include . . . walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking ... [u]nderstanding, carrying out, and remembering simple instructions ...

[u]se of judgment ... [r]esponding appropriately to supervision, co-workers and usual work situations. *Gibbs v. Astrue*, 2008 WL 2627714, at *16 (S.D.N.Y. 2008); 20 C.F.R. § 404.1521(b)(l)-(5).  It is plaintiff's burden to present evidence establishing severity.  *Miller v. Comm'r of Social Sec.*, 2008 WL 2783418, at *6-7 (N.D.N.Y. 2008); see also 20 C.F.R. § 404.1512(a).  Courts have held that this step is limited to "screen[ing] out *de minimis* claims". *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  However, the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, itself, sufficient to deem a condition severe.  *Coleman v. Shalala*, 895 F.Supp. 50, 53 (S.D.N.Y.1995).  "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  *Rosario v. Apfel*, 1999 WL 294727 at *5 (E.D.N.Y. 1999) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987)).

In this case, the ALJ found that plaintiff's depression and asthma were "severe impairments".  The ALJ further concluded that:

> . . . after reviewing the medical records [the ALJ] determines that the claimant's seizure disorder, carpal tunnel syndrome, headaches and sleep apnea are not "severe" impairments within the meaning of the Federal regulations. (T. 19).[27]

With regard to plaintiff's carpal tunnel syndrome, the ALJ stated that:

> . . . the last time she sought any treatment for right wrist pain was in February 2003, and at that time EMG testing revealed only mild dysfunction.  The claimant does not report having any surgery and there is no record of complaint [sic] of right wrist pain in the record after that date.  The examining physician Lisa Zhang, M.D. advised

---

[27] Plaintiff does not object to the ALJ's determination that plaintiff's seizure disorder was not a severe impairment within the meaning of the Regulations.

based on her examination of June 12, 2003 that the claimant had an unremarkable examination of the right wrist.  (T. 19-20).[28]

Upon review of the record, the Court finds the ALJ's determination that plaintiff's carpal tunnel syndrome was not severe is supported by substantial evidence.  On December 23, 2002, plaintiff first complained of right wrist pain, however plaintiff did not receive any treatment for those complaints.  (T. 183).  In February 2003, Dr. Khan performed an EMG which was "suggestive of mild median neuropathy" on the right side. (T. 186).  However, Dr. Khan never treated plaintiff for carpal tunnel syndrome nor is there any record of any other treatment of plaintiff's carpal tunnel syndrome by any other physician.  During plaintiff's initial examination with Dr. Adetona, plaintiff stated that she suffered from right wrist tendinitis.  However, Dr. Adetona never diagnosed plaintiff with any impairment relating to plaintiff's right wrist. (T. 174-175).  On June 12, 2003, Dr. Zhang, a consultative examiner, found plaintiff's "hand and finger dexterity intact" and "grip strength right 4/5 and left 5/5". (T. 124).  Similarly, an x-ray of plaintiff's right wrist was "unremarkable". (T. 126).

When plaintiff testified before the ALJ, she stated that she did not have surgery for carpal tunnel syndrome. (T. 278).  Plaintiff also testified that she could "probably" lift 15 pounds and that she did not have any problem pushing a grocery cart, taking items off of a shelf or putting items in a basket. (T. 278-279).  Given plaintiff's testimony and her lack of treatment for carpal tunnel syndrome, the Court finds that the ALJ's determination that plaintiff's carpal tunnel syndrome was not a severe impairment is supported by substantial evidence.

The ALJ also discussed plaintiff's migraine headaches and sleep apnea and found:

---

[28] In Finding #3, the ALJ listed plaintiff's right carpal tunnel syndrome as a "severe" impairment.  (T. 23). However, in the "Evaluation of the Evidence", the ALJ noted that plaintiff's carpal tunnel syndrome was not a severe impairment. (T. 19).

. . . although the claimant has described frequent headaches, and did receive treatment for them, she has not recently reported any problems to her treating physicians.  With respect to the claimant's sleep apnea the record indicates that provision of the CPAP machine resulted in improvement in her condition and less daytime sleepiness.  (T. 20).

Regarding plaintiff's headaches, plaintiff had three visits with a neurologist, Dr. Khan. (T. 180- 186).  Dr. Khan never diagnosed plaintiff with any neurological abnormality related to her headaches.  *See Banks v. Massanari*, 258 F.3d 820, 826 (8th Cir. 2001) (holding that lack of medical treatment for headaches and vague testimony at hearing failed to establish that plaintiff's headaches resulted in any more than a slight limitation in her ability to engage in work-related activities).  On December 23, 2002, Dr. Khan noted that plaintiff's headaches were "better" and that her headaches were "well controlled" with medication. (T. 183).   Further, an MRI of plaintiff's brain was negative. (T. 179).  In December 2004, plaintiff complained of headaches to her primary care physician, Dr. Adetona. (T. 165-166).  Dr. Adetona noted that plaintiff's headaches were "improved with Ultracet". (T. 165).   At the time of the hearing, plaintiff testified that she was not receiving any treatment or taking any medication for her migraine headaches. (T. 285).   The Court finds that substantial evidence supports the ALJ's determination that plaintiff's headaches did not impose a significant restriction that impaired her ability to engage in gainful activity.

Finally, with respect to plaintiff's sleep apnea, there is substantial evidence supporting the ALJ's determination that plaintiff's sleep related impairments did not impose a significant work related limitation.  While plaintiff was diagnosed with mild to moderate sleep apnea, no physician suggested that plaintiff's sleep apnea imposed functional restrictions.  *See Limpert v. Apfel*, 1998 WL 812569, at *3 (E.D.N.Y. 1998) (physicians reports did not make any reference to any disabling effect of the plaintiff's sleep disturbances).  On October 9, 2004, Dr. Shah noted

plaintiff was "feeling better with CPAP use and treatment of her allergic rhinitis". (T. 187). During the administrative hearing, plaintiff testified that she had difficulty sleeping but also admitted to napping for "a couple of hours" during the day. (T. 282). The Court finds that substantial evidence supports the ALJ's determination that plaintiff's sleep apnea was not a severe impairment.

Accordingly, the Court finds that substantial evidence exists to support the ALJ's determination regarding the severity of plaintiff's impairments.

**B.      RFC Assessment**

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence. (Dkt. No. 11, p. 16). Defendant claims that the ALJ's decision is supported by the findings of plaintiff's treating and examining physicians and clinical test results. (Dkt. No. 13, p. 9).

Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)). In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a)**.**

In this case, the ALJ found that plaintiff had the RFC to:

perform work at a medium exertional level; with occasional but not frequent repetitive use of the dominant right hand; with no concentrated exposure to dust, fumes, odors, gases, smoke or poor ventilation; with no driving for business purposes; with no work with dangerous machinery, such as saws or blades; with no climbing ladders or work at heights; in a low stress environment, with no planning, scheduling, report-writing, supervising or high production quotas; in simple entry-level work, with simple but not complex decision-making; with the ability to change position as needed, with a sit/stand option every 30 to 40 minutes; with little or no interaction with the public, either face-to-face, or on the phone; and with occasional but not frequent interaction with co-workers, working in proximity to co-workers, but only occasionally in coordination or conjunction with them.  (T. 21).

Regarding the RFC determination, plaintiff argues that the ALJ: (1) improperly relied upon the opinion of a non-physician disability analyst; (2) failed to adequately develop the record; (3) failed to provide functional limitations; and (4) failed to incorporate plaintiff's non-exertional impairments into the RFC assessment.  (Dkt. No. 11, pp. 16-20).

### 1.    Medical Opinions and the ALJ's Duty to Develop Record

Plaintiff argues that the ALJ should have done more to develop the evidence from plaintiff's treating physicians regarding plaintiff's RFC.  (Dkt. No. 11, p. 18).  Plaintiff also claims that the ALJ improperly relied upon the opinion of the disability analyst as it was based on Dr. Zhang's "vague" opinion. (Dkt. No. 11, p. 18).  Defendant argues that the ALJ properly relied upon Dr. Zhang's opinion because no other physician provided an assessment of plaintiff's ability to perform work related tasks. (Dkt. No. 13, p. 9).

In the decision, the ALJ noted that "[n]one of claimant's treating physicians have provided an assessment with respect to her ability to meet the exertional demands of work-related tasks". (T. 20).  The ALJ  assigned "substantial weight" to the opinion of the disability analyst who reviewed plaintiff's claim at the request of the agency. (T. 20).  The ALJ reasoned that "this

opinion is consistent with that of the examining physician" and further that "there is no inconsistent substantial medical evidence in the record".[29] (T. 20).

An ALJ must affirmatively develop the record in light of the "essentially non-adversarial nature of a benefits proceeding", even if the claimant is represented by counsel. *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *see also Echevarria v. Secretary of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)). The duty of an ALJ to develop the record is "particularly important" when obtaining information from a claimant's treating physician due to the "treating physician" provisions in the regulations.[30] *Devora v. Barnhart*, 205 F.Supp.2d 164, 172 (S.D.N.Y. 2002). "There is ample case law suggesting that an ALJ has an independent duty to make reasonable efforts to obtain a report prepared by a claimant's treating physician in order to afford the claimant a full and fair hearing." *Devora*, 205 F.Supp. 2d at 174 (collecting cases). This obligation includes obtaining the treating physicians' assessments of plaintiff's functional capacity. 20 C.F.R. § 404.1512(e); *see also Hardhardt v. Astrue*, 2008 WL 2244995, at *9 (E.D.N.Y. 2008).

The Regulations state, in relevant part: "Before we make a determination that you are not disabled, we will develop your complete medical history ... [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." *Pabon v. Barnhart*, 273 F.Supp.2d 506, 517 (S.D.N.Y. 2003) (citing 20 C.F.R. § 416.912(d)); *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand

---

[29] The ALJ did not specifically assign weight to Dr. Zhang's opinion. The ALJ noted that Dr. Zhang "expressed the general opinion that claimant would have mild restrictions for carrying and lifting with the right hand, and should avoid driving or operating heavy machinery as well as avoid smoke, dust or known respiratory irritants". (T. 20).

[30] Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

is necessary if the ALJ fails to attempt to contact the plaintiff's treating physician to properly determine her RFC. *See Rosa v. Apfel,* 1998 WL 437172, at *4 (S.D.N.Y. 1998); *see also Hopper v. Comm'r of Social Sec.*, 2008 WL 724228, at *11 (N.D.N.Y. 2008); *see also Oliveras ex rel. Gonzalez v. Astrue*, 2008 WL 2262618, at *6-7 (S.D.N.Y. 2008) (holding that remand is appropriate even where there is no guarantee that the outcome will change, so that the ALJ can make reasonable efforts to obtain the treating physicians opinion on functional capacity).

A non-examining source's opinion, including the opinions of state agency medical consultants and medical experts, will be given less weight than an examining source's opinion. 20 C.F.R. § 416.927(d)(1)*; see Pogozelski v. Barnhart*, 2004 WL 1146059, at *13 (E.D.N.Y. 2004). Moreover, the opinion of an examiner whose title or qualifications are not set forth on the RFC form is not entitled to any weight. *Dejesus v. Barnhart*,  2007 WL 528895, at *7 (W.D.N.Y. 2007).  The general rule is that "the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability". *Vargas v. Sullivan*  898 F.2d 293, 295-296 (2d Cir. 1990); *see also Havas v. Bowen,*  804 F.2d 783, 786 (2d Cir. 1986) (concluding that the opinions of non-examining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians).

In this case, the administrative transcript does not contain any statements from any treating physician regarding how plaintiff's impairments affect her ability to perform work-related activities. The ALJ assigned "great weight"to Dr. Achar's opinions. (T. 20)  However, Dr. Achar did not provide any functional analysis of plaintiff's limitations and therefore, the ALJ essentially assigned "great weight" to the opinions expressed in his treatment notes.  The ALJ failed to assign weight to the opinions of plaintiff's other treating physicians including Drs. Khan, Bruce, Rehman, Shah or Adetona.  The ALJ's failure to explain the weight he gave to the

opinions was legal error.  The ALJ had nothing more to consider than treatment records.  In fact, the records from Dr. Adetona, plaintiff's primary care physician, are entirely handwritten and difficult to decipher.  The ALJ did not recite or apply any of the factors set forth at 20 C.F.R. 404.1527(d)(2) and without the benefit of such analysis, it is impossible to determine whether the ALJ's determination is supported by substantial evidence.

The Court further finds that the ALJ improperly assigned significant weight to the opinion of the state agency medical consultant.  The record does not contain any information regarding the analyst's title or qualifications.  Moreover, the analyst clearly relied upon the examination and opinions of Dr. Zhang, the consultative physician who examined plaintiff once.  Dr. Zhang's opinion did not provide a functional analysis and Dr. Zhang only opined that plaintiff had "mild restrictions".  (T. 20).  Therefore, Dr. Zhang's assessment failed to provide the necessary information to enable the ALJ to properly assess plaintiff's RFC.  *See Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (holding that consulting physicians opinion that the plaintiff's impairment was "lifting and carrying moderate; standing and walking, pushing and pulling and sitting mild" lacked specificity and did not permit the ALJ to make the necessary inference that the plaintiff could perform the exertional requirements of sedentary work).   Accordingly, the Court finds that the ALJ improperly assigned "significant weight" to the opinions of the disability analyst.

The ALJ had an affirmative duty, even if plaintiff was represented by counsel, to develop the medical record and request that plaintiff's treating physicians assess plaintiff's functional capacity.  Consequently, the ALJ's failure to seek medical evaluations from plaintiff's treating sources and to apply the proper standard to assess plaintiff's ability to meet the demands of work, deprived plaintiff of a full hearing.  *Rosado v. Barnhart,* 290 F.Supp.2d 431, 441-442 (S.D.N.Y. 2003) (citing *Echevarria,* 685 F.2d at 755).

Upon remand, the ALJ shall attempt to obtain functional evaluations from plaintiff's treating physicians and properly analyze the opinions of the treating physicians, consultative examiner and non-examining consultant according to the Commissioner's Regulations.

### 2.      Function by Function Analysis

Plaintiff argues that RFC assessment was inadequate as the ALJ did not detail plaintiff's specific limitations on a "function by function" basis.[31]  (Dkt. No. 11, p. 17).  The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis.  SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  To determine RFC, the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, based on medical reports from acceptable medical sources that include the sources' opinions as to the claimant's ability to perform each activity.  20 C.F.R. § 404.1513(c)(1); §§ 404.1569a(a), 416.969a(a); *Martone v. Apfel*, 70 F.Supp.2d 145, 150 (N.D.N.Y. 1999).  Only after that analysis is completed, may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.  *Hogan v. Astrue*, 491 F.Supp.2d 347, 354 (W.D.N.Y. 2007).

In failing to do a function-by-function assessment, the ALJ may make the mistake warned of in SSR 96-8p.  *Mardukhayev v. Comm'r of Social Sec.*, 2002 WL 603041, at *5 (E.D.N.Y. 2002) (internal citation omitted) (failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions.").

In the case at hand, the ALJ did not discuss the amount which plaintiff could lift and/or carry or the amount of time plaintiff could walk, stand, and sit.  The ALJ merely reported his RFC

---

[31] The Commissioner did not provide a response to this argument.

finding in conclusory fashion devoid of specifics regarding plaintiff's precise limitations.  Thus, the case is remanded for proper evaluation of Plaintiff's RFC including a function by function analysis of plaintiff's limitations.

### 3.      Omission of Non-Exertional Impairments from RFC Assessment

Plaintiff argues that the ALJ failed to take into consideration plaintiff's tiredness, pain, headaches and the effects of depression in determining plaintiff's RFC.  (Dkt. No. 11, p. 19).  Defendant argues that the ALJ clearly accounted for plaintiff's non-exertional limitations in the RFC analysis.  (Dkt. No. 13, p. 10).

Upon review of the record, the Court cannot determine whether or not the ALJ properly assessed plaintiff's RFC.  As previously discussed, the ALJ failed to adequately develop the record with respect to plaintiff's treating physicians, improperly assigned "substantial weight" to the opinion of the disability analyst and failed to provide a "function by function" analysis.  Moreover, it is unclear on what specific evidence the ALJ relied in assessing plaintiff's RFC as the ALJ failed to cite to any medical opinion or treatment record in support of the RFC assessment.  Therefore, the Court cannot determine whether or not the ALJ's determination of plaintiff's RFC is supported by substantial evidence.

Based upon the aforementioned, the Court finds that the ALJ's analysis of plaintiff's RFC is not supported by substantial evidence and remands the matter for a proper evaluation of plaintiff's RFC.

### C.      Vocational Expert

Plaintiff argues that the ALJ erred when he relied upon the vocational expert's response to a hypothetical question that did not accurately reflect plaintiff's limitations. (Dkt. No. 11, p. 22).  Plaintiff further claims that the jobs cited by the ALJ in the decision are not the same jobs given

in response to the hypothetical and therefore, the decision is not based upon substantial evidence. (Dkt. No. 11, p. 23). Defendant argues that the inclusion of these jobs in the decision clearly amounts to "harmless error" as the ALJ found that plaintiff could perform jobs that were consistent with her RFC and existed in significant numbers. (Dkt. No. 13, p. 12).

At the fifth step of the sequential evaluation of disability, the Commissioner bears the responsibility of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy in light of plaintiff's residual functional capacity, age, education, and past relevant work. 20 C.F.R. §§ 416.920, 416.960. Ordinarily, the Commissioner meets his burden at this step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). Sole reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's limitations. *Id*. at 606. For example, use of the grids as the exclusive framework for making a disability determination may be precluded where plaintiff's physical limitations are combined with non-exertional impairments which further limit the range of work she can perform. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). In these circumstances, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp*, 802 F.2d at 603; *see also Melchior v. Apfel*, 15 F. Supp. 2d 215, 58 (N.D.N.Y. 1998) (stating "where nonexertional limitations significantly diminish the ability to perform a full range of work, it is appropriate that the ALJ present testimony from a vocational expert").

A hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony. *Bosmond v. Apfel*, 1998 WL 851508, at *8 (S.D.N.Y. 1998) (citation omitted); *see also De Leon v. Secretary*, 734 F.2d 930,

935 (2d Cir. 1984). If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. *Melligan v. Chater*, 1996 WL 1015417, at *8 (W.D.N.Y. 1996). The "[p]roper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform." *Lugo v. Chater*, 932 F. Supp. 497, 503 (S.D.N.Y. 1996). Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983).

As discussed above, the ALJ failed to properly analyze plaintiff's RFC. Consequently, the hypothetical questions posed to the vocational expert did not accurately reflect all of the plaintiff's impairments, limitations and restrictions and the ALJ erred when he relied upon the expert's response. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981) (stating that testimony of a vocational expert is only useful if it addresses the particular limitations of the claimant).

## VI.    CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with the above; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: April 17, 2009
       Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge